BUCKLEY v. NEW YORK, N. H. & H. R. CO.

(Circuit Court, D. Connecticut. October 24, 1906.)

No. 581.

RAILROADS—KILLING OF LICENSEE ON TRACK—NEGLIGENCE OF PERSON KILLED.

Plaintiff's intestate was employed by a contractor with other workmen in widening a deep cut on defendant's railroad in which there was a sharp curve of the track. During the 10 days he had worked, a passenger train had passed each morning within a very few minutes of the same time. This train was required by law not to sound a whistle before approaching the cut, but to ring the bell. On the morning in question deceased had gone across the track from his work and when the train, which was on time, approached, was standing on the ends of the ties dipping water from the ditch into a pail. When the train came around the curve at a speed of about 10 miles an hour, and when about 150 feet distant he was seen by the engineer who blew an alarm whistle and applied the brakes. Deceased straightened up, looked, and then picked up his pail and started back across the track. He passed from the engineer's sight in front of

the engine when it was 15 or 20 feet distant and making a speed of 4 to 5 miles an hour, but was struck and killed. He might have escaped by stepping across the ditch and standing next to the bank on the side of the track where he stood. The bell was being rung, but, owing to the noise made by stationary engines on the work, could not well be heard. *Held*, that defendant was not negligent, and also that deceased was clearly guilty of negligence which was the proximate cause of his death, both in going upon the track at the time the train was due, and by his inattention afterward.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, §§ 1285–1296.]

At Law.

Schutz & Edwards and William A. Pew, for plaintiff.

Watrous & Day, for defendant.

PLATT, District Judge. This is an action at law, asking damages for the death of the plaintiff's intestate, which is claimed to have occurred by reason of the defendant's negligence, and the jurisdiction of the court is ample. The defendant suffered a default, gave the lawful notice, and thereupon, in accordance with our state practice, the matter has come before me on a hearing in damages; and, after listening to the evidence presented by the parties, and the arguments of counsel, I find the following facts:

On August 31, 1905, plaintiff's intestate, Joseph Bertoni, late of Quincy, Mass., was employed by John Cashman at Putnam, Conn., as a laborer upon a job of rock and dirt excavation, which said Cashman was doing under a contract with defendant for the general purpose of widening a cut and reducing the curves on the railroad at that point. He began work there on August 22, 1905. He was 35 years old, in good health, and had a wife and one child. He was rarely ill, and earned on this job $2.08 per day. His wages varied on different jobs, never running higher than $2.50, nor lower than $2 per day. His particular employment was to look after and keep in condition the drills used in boring holes for the blasts. In doing this he was obliged to keep water in the holes, so that the drills should not become overheated. There is an arch bridge over the Quinnebaug river about 1,000 feet south of the Putnam station. Between the bridge and the station, the single track, at that time, ran for about 400 feet through a rather deep cut upon a sharp curve. The contract work was directed toward widening this cut on the westerly side, leaving the easterly wall of the cut intact. The defendant ran a regular passenger train over the Norwich Branch of the Shore Line Division, leaving New London at 5:30 a. m., and reaching Putnam at 7:25 a. m. From August 22d to 31st, inclusive, this train reached the described cut at substantially the same time each morning, which was between 7:20 and 7:25. Cashman employed about 30 men on his job, and they began work at 7 o'clock a. m. There were two engines set up on the westerly side of the cut about 250 feet apart, each operating a set of drills; the southerly one being just around the first bend of the cut after coming over the arch bridge, and back from the track, perhaps 15 feet. It operated drills which were south of it, and several feet from the track.

On the morning of the accident Bertoni, soon after reporting for work at 7:00 a. m., had gone across the track with a pail and dipper, and was standing upon the end of the ties scooping up water from the ditch made by the track and the easterly wall of the cut. It is not possible to give the distance from the ties to the wall of the cut at the precise point where he stood, because no one can tell just where he stood, and the surface of the roadbed has been materially changed, although the wall remains. The witnesses vary in their estimates of the width of the ditch at about that point; some making it as narrow as 2½ feet, others making it 4 feet. The wall beyond was at least 5 feet high, in a practically perpendicular direction, and then sloped off, so that its general height was about 15 feet. It was not possible to climb it quickly, but there was room enough between the track and the wall, so that the deceased could have pressed against it in an upright position, or have thrown himself flat in the ditch, and, by either means, have avoided contact with the passing train. Defendant's train referred to reached the arch bridge practically on time. Upon petition of the selectmen of Putnam the railroad commissioners had passed an order, which was then in force, that no whistles should be blown at crossings from the arch bridge on the south to a certain point north of the station, but that a bell should be rung in lieu thereof, and recommending that the use of the whistle in the operation of the road within those limits be reduced to the least possible minimum consistent with the safe operation of the railroad. In accordance with such order the blowing of the whistle had been for more than a month, and was, on August 31st, omitted after reaching the bridge, but the bell was kept constantly ringing after passing a post just north of the bridge. Before reaching the bridge on the morning in question, the train had been going perhaps 30 miles an hour. At the bridge the engineer applied the service brake —the one ordinarily used on such occasions, and this reduced the speed, so that when he reached the cut the train was under control, running at a rate of about 10 miles an hour. While going at this speed, Bertoni, standing on the ties, stooping over, and bailing up water, as described, came into his vision from the right hand cab window, out of which he had been watching the track. The engine was then about 150 feet away from Bertoni. The engineer at once sounded the danger alarm whistle, and applied the service brake. When the alarm sounded, Bertoni straightened up, looked around toward the engine, then turned back, picked up his pail, and started across the track toward the west, going out of the engineer's sight. The fireman at the left hand cab window said, "All right!" and the engineer then released the brake, but at once applied it again, stopping the train in the length of three cars. The mangled and dead body of Bertoni was found lying across the track just between the last two coaches of the train. When the engineer first saw Bertoni the speed of the train, as I have said, did not exceed 10 miles per hour. At that rate, it would have taken about 10 seconds to have reached Bertoni, but the service brake was applied within two or three seconds, and the speed must have been at once materially reduced, so that when the engine came abreast of Bertoni it was not going faster than four or five miles an hour. He had disappeared from

the engineer's sight when the engine was 15 or 20 feet away from the place where he was first seen. It is difficult to know what interfered with his getting safely across to the west. The testimony tends to show that he was quite slow in starting, and that his course across the track was diagonally toward the north. The probabilities are that he miscalculated and was swept back upon the cowcatcher of the engine, just as he was at the very point of safety.

A fellow workman was standing on the westerly bank, some nine feet from the track, marking out places for drill holes with a long pole. He heard the warning whistle, and saw Bertoni straighten up, look around, and take a step onto the track toward his side. He dropped his pole and rushed over the nine feet of ground which separated him from the track, but finding the engine upon him, he dodged backward, and fell over upon the westerly bank. He was seen falling backward by the fireman, who, not having seen Bertoni, naturally supposed that he was the one on account of whom the engineer blew the danger signal, and whose escape led him to say, "All right."

The law of the case is not difficult. The engineer stood in the place of the master. It was his duty to operate the train through the cut in the way that a reasonably prudent man ought to have done it. He was bound to know and take into account all the circumstances of the case and govern himself accordingly. It was a very dangerous cut and curve. It was his duty to go through it with his train under control, keeping a sharp lookout. When danger appeared he was bound to act promptly and vigorously. Now that the thing is over, we can see that if when he saw Bertoni he had applied the emergency brake, the life would have been saved, but we cannot say that the error in not doing so, if it be an error, is one which should compel the defendant to pay substantial damages. There is no suggestion that he was not entirely competent. There is nothing in his actual conduct which condemns him as incompetent. As to defendant's negligence, the case is reasonably close; but, on the whole, I am bound to find that the defendant, by the evidence, has disproved the charge of negligence, which, by our peculiar method of pleading, it had admitted. I am the more willing to do so, because on the cognate charge of the contributory negligence of plaintiff's intestate I am unhesitatingly in accord with the defendant.

Plaintiff's intestate had been working on the ground for a week or more. Every morning, with unusual regularity, this same train had come through that cut at practically the same moment. It was in the very beginning of Bertoni's morning work upon the job. Whistles were not blown, except in cases of danger, and the noise of the excavating machines made it difficult to hear the ringing bell upon the engine. These things Bertoni knew, or ought to have known. The defendant's license or invitation to him to go upon the track presupposed a condition of at least comparative safety upon the track. The risk which he ran in going there at the time he selected was an obvious one, and it was his duty in that situation to look and listen. An ordinarily prudent man would have done so; but he did not. He was so sluggish of intellect that the sharp signal of danger, which alarmed several people

at greater distances, did not arouse him to instant action. The precious moments passed, and the dreadful end of life came to him, because when first warned, he wavered. It was very close to negligence to go upon the track at the time he chose for the excursion. To act as he did after he was upon it, was careless beyond peradventure, and if he had not so acted, he might to-day be able to support his family. His negligence was the proximate cause of his death.

There are no other questions in the case. I think that the defendant has, by a hair, disproved the allegations of negligence, and that it clearly appears from the evidence that the plaintiff's intestate was guilty of contributory negligence.

It follows, under our practice, that the plaintiff is entitled to only nominal damages, which, in this case, may be fixed at $25.